# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WISCONSIN PROVINCE OF THE : 
SOCIETY OF JESUS : 
    Plaintiff(s), :     No. 3:17-CV-01477 (VLB)
     :
    v. :
     :     March 18, 2019
AUDREY F. CASSEM, THOMAS F. :
OWENS, II, et al., :
    Defendants. :
     :
     :

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS [DKT. 58]

### I.    Introduction

Plaintiff, the Wisconsin Province of the Society of Jesus ("Province" or "Plaintiff"), brings this claim against Defendants, Audrey F. Cassem and Thomas F. Owens ("Defendants"), concerning two retirement accounts held by the late Rev. Edwin H. "Ned" Cassem ("Fr. Cassem"). Before the Court is Defendants' Motion to Dismiss Count One of the Amended Complaint, which seeks "declaratory judgment that the original beneficiary designations remain enforceable pursuant to 28 U.S.C. §§ 2201 and 2202" on the grounds that "[a]s a result of his vows, Fr. Cassem did not own the funds in the TIAA-CREF Accounts and thus, did not have the authority to designate a beneficiary in place of the province." [Dkt. 44 (Amended Complaint) at 8-9]. Defendants argue that Plaintiff's claim is preempted by the Employment Retirement Income Security Act of 1974 (ERISA) and that ERISA's anti-alienation provision prohibits Plaintiff from asserting a contractual

right to Fr. Cassem's retirement accounts. [Dkt. 58 (Motion to Dismiss)]. For the following reasons, Defendants' Motion to Dismiss is GRANTED as to Count One.[1]

## II.  Background

The following facts are taken from the Amended Complaint [Dkt. 44]. The facts alleged in the Amended Complaint are taken as true and construed in the light most favorable to Plaintiff for the purpose of a motion to dismiss. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Province is a nonstock corporation organized in Wisconsin with its principal place of business in Chicago. [*Id.* at ¶ 2]. The Province is one of several geographical subgroups of the Society of Jesus (the "Society"), commonly known as the "Jesuits." [*Id.*] Defendant Audrey V. Cassem ("A. Cassem") is the widow of Fr. Cassem's deceased brother, John M. Cassem. [*Id.* at ¶ 3]. Defendant Thomas M. Owens, II ("Owens") is the son of A. Cassem from a marriage that predated her marriage to John M. Cassem. [*Id.* at ¶ 4].

Fr. Cassem was a lifelong Jesuit and member of the Province. [Dkt. 44, ¶ 11]. He died on July 4, 2015. [*Id.* at ¶ 1]. He entered the society in 1953, at the age of eighteen. [*Id.* at ¶ 12]. He was ordained on June 4, 1970, and pronounced his "final vows of perpetual poverty, chastity, and obedience on December 26, 1985." [*Id.* at ¶ 14]. While a member of the Society, Fr. Cassem obtained an undergraduate degree in psychology and a medical degree in psychiatry. [*Id.* at ¶ 13].

---

[1] Insofar as Count Four is based on identical allegations regarding a contractual right against Defendant TIAA-CREF, Count Four is also dismissed.

Following his graduation from Harvard Medical School, Fr. Cassem began what would become a long and distinguished career as a psychiatrist in Boston, Massachusetts at Massachusetts General Hospital ("MGH") and Harvard Medical School ("HMS"). [Dkt. 44, ¶ 16]. He founded the Optimum Care Committee at MGH in 1973 and chaired it until 2009. [*Id.* at ¶ 17]. He served as Chief of Psychiatry at MGH from 1989 to 2000. [*Id.*] Fr. Cassem conducted research on the relationship between depression and heart disease and worked in palliative and end-of-life care. [*Id.* at ¶ 18].

Throughout Fr. Cassem's career, he "tendered his income, as he earned it, to the Province, and the Province, in turn, provided for his lifelong wants and needs. [Dkt. 44, at ¶ 15]. This was in fulfillment of his vows, which included "a renunciation of his right to own property." [*Id.*] Plaintiff alleges that the vow of poverty:

> Enables each Jesuit to live simply and promotes a feeling of empathy for the poor. Jesuit priests share possessions communally. Accordingly, a Jesuit turns over all after-acquired property to his province after taking his vows, and the province, in turn, provides for his wants and needs . . . Each member of the community relinquished title to personal property and monies, turned over money and property for their common benefit, and, in return, received a living sustenance in the form of food, shelter, health insurance premiums, car payments and car insurance.

[*Id.* at ¶ 14 n. 3].

In connection with his positions at MGH and HMS, Fr. Cassem accumulated two retirement accounts with TIAA-CREF (the "Accounts"). [Dkt. 44, at ¶ 20]. As of September 30, 2017, the value of the funds in the Accounts was $1,258,530.07 in "TIAA-A741815-3" and $253,656.04 in CREF-P741815-0. [*Id.* at ¶ 23]. In 1976,

Fr. Cassem executed beneficiary designation forms with TIAA-CREF naming the Province as the beneficiary for the TIAA-CREF accounts. [*Id.* at ¶ 21].

Beginning in roughly 2010, Fr. Cassem "began to display symptoms of dementia, which symptoms became significantly worse over time." [Dkt. 44, at ¶ 24]. In or around December 2010, Fr. Cassem moved into A. Cassem's home in West Hartford. [*Id.* at ¶ 25]. In or around December 2010, Fr. Cassem "was taken to a local attorney, previously unknown to him, and executed a Durable Power of Attorney in favor of Owens." [*Id.* at ¶ 26].

On or about January 11, 2011, "TIAA-CREF received a form purportedly executed by Fr. Cassem" that changed the beneficiary of the Accounts from the Province to A. Cassem, as primary beneficiary, and Owens, as contingent beneficiary. [Dkt. 44, at ¶ 22]. At this time, Fr. Cassem was seventy-five years old, residing alone with A. Cassem, and "living hundreds of miles away from any blood relatives and hours away from his friends and colleagues at the Society." [*Id.* at ¶ 27]. Fr. Cassem continued to live with A. Cassem until his death in 2015. [*Id.* at ¶ 28].

On September 1, 2017, the Province brought this action against Audrey Cassem, Thomas Owens II, TIAA-CREF, and Neil Kraner in his capacity as Temporary Administrator of the Estate of Edwin H. Cassem. [Dkt. 1]. Defendant TIAA-CREF filed a Counterclaim for interpleader on November 13, 2017, asking the Court to order that Plaintiff and Defendants A. Cassem, Thomas Owens, and Neil Kraner interplead their respective claims amongst themselves. [Dkt. 22 (Answer to Complaint and Counterclaim for Interpleader), at 8]. Plaintiff filed the

Amended Complaint on June 7, 2018.  [Dkt. 44].  TIAA-CREF filed a renewed counterclaim for interpleader on July 4, 2018.  [Dkt. 51].  Defendants A. Cassem and Thomas Owens filed this Motion to Dismiss on August 20, 2018.  [Dkt. 58].

### III.   Legal Standard

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

Rule 8(a) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Twombly,* 550 U.S. at 570.  A claim

is "facially plausible" when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

IV.    Discussion

Plaintiff alleges that the change in beneficiary designation was improper because Fr. Cassem's vows prevented him from legally acquiring personal property and, therefore, he never owned the Accounts.  Plaintiff alleges that "Fr. Cassem's final vows constitute an enforceable contract among and between the Province and Fr. Cassem, through which Fr. Cassem fully and finally renounced and assigned any and all property then owned or later acquired to the Province." [Dkt. 44, at ¶ 33].  The Province argues that because Fr. Cassem was not entitled to retain or direct property for the benefit of any party other than the Province, the original designation of the Province as the beneficiary of the Accounts remains valid and enforceable.  [*Id.* at ¶ 38].

Defendant argues that Fr. Cassem's contractual obligation to tender property to the Province is pre-empted and legally barred by the Employee Retirement Income Security Act of 1974 (ERISA).  [Dkt. 58-1 (Memo. of Support of Defendant's Motion to Dismiss), at 2-3].  Specifically, Defendant invokes § 514(a) of ERISA, which states that the Act pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," with exceptions. *See* [Dkt. 58-1, at 8] (quoting 29 U.S.C. § 1144(a)).  Furthermore, Defendants argue that Fr. Cassem's rights to designate a beneficiary could not be alienated due to the ERISA provision stating that "[e]ach pension plan shall provide that benefits

provided under the plan may not be assigned or alienated." *See* [Dkt. 58-1, at 16] (quoting 29 U.S. C. § 1056(d)(1)).

**A.  Whether Fr. Cassem's Vows are Enforceable**

Plaintiff argues in briefing that the Province has a right to the accounts because Fr. Cassem's vows are enforceable under federal common law.  [Dkt. 64, at 4-10].  Although Plaintiff cites precedent for the proposition that a cause of action exists at federal common law, the courts in Plaintiff's cases all say they are interpreting the enforceability or validity of a contract.  It is axiomatic that contract formation is governed by state law in the United States.  The Amended Complaint even characterizes the vows as an "enforceable contract."  [Dkt. 44, at ¶¶ 33, 34].   Therefore, the Court construes Count One as alleging a contractual right.  Formation of a contract generally requires a bargain in which there is a manifestation of mutual assent and a consideration.  *See* Restatement (II) of Contracts, § 17; *see e.g. Knauss v. Ultimate Nutrition, Inc.*, 514 F. Supp. 2d 241, 245 (D. Conn. 2007).  Plaintiff pleads facts supporting the inference that Fr. Cassem and the Province formed a contract in which Fr. Cassem provided all of his income and property to the Province, and in return the Province paid for his undergraduate and medical studies and his living expenses throughout his life. *See* [Dkt. 44, at ¶¶ 14, 14 n. 3, 15, 19, 21, 32-34].

The case principally relied on by Plaintiff, *Order of St. Benedict v. Steinhauser*, does not create federal common law requiring the enforcement of religious vows.  *See Order of St. Benedict of New Jersey v. Steinhauser,* 234 U.S.

640 (1914). Plaintiff argues that "[i]n *Steinhauser*, a unanimous Supreme Court applied long-standing <u>federal</u> precedent to explicitly recognize '[t]he validity of <u>agreements</u> providing for community ownership with renunciation of individual rights of property during the continuance of membership in the community, where there is freedom to withdraw, has repeatedly been affirmed." [Dkt. 73 (Plaintiff's Sur-Reply to Defendant's Memorandum of Law) at 2] (quoting *Steinhauser*, 234 U.S. at 649) (emphasis added). This statement mischaracterizes the opinion. In *Steinhauser*, Augustin Wirth – a member of the religious Order of St. Benedict – took a similar vow to that allegedly taken by Fr. Cassem. *See id.* at 642. The Order's constitution included the provision that "the real estate of said order and the individual earnings of its members are and must be considered as common property of the Order of St. Benedict of New Jersey, from which the members of said Order derive their support, and the balance of which income and property should serve for following up and carrying out of the charitable objects of the Order." *Id.* at 642-43. The Supreme Court identified the question before it by stating that it was "not concerned in the present case with any question of ecclesiastical requirement or monastic discipline. The question is solely one of civil rights." *Id.* at 641-42. First, the Court interpreted the constitution of the Order to determine whether Wirth had some special dispensation to retain certain property. *Id.* at 642-47. It concluded that he did not. *Ibid.* Second, the Supreme Court was "brought to the question whether the requirement [to renounce all property], which lies at the foundation of this suit, is void as against public policy." *Id.* at 647. The Court found that the requirement was not contrary either

to Wirth's individual liberty or the inherent right to acquire and hold property, or to New Jersey public policy.  *Id.* at 649.  These two holdings were the extent of the opinion in *Steinhauser*.  The Supreme Court did not hold that federal common law required enforcement of the agreement – the Court applied New Jersey law to enforce the contract and cited federal cases to determine whether the contract was contrary to public policy.

   Contrary to Plaintiff's assertions, "federal common law" does not recognize religious oaths as enforceable as a distinct category from contract law.  *See* [Dkt. 64, at 5].  The cases cited by Plaintiff all enforce *contracts.*  The Supreme Court in *Steinhauser* relies, in part, on a 19th century case characterizing the vows of a religious order as follows:

> An association of individuals is formed under a religious influence, who are in a destitute condition, having little to rely on for their support but their industry; and they agree to labor in common for the good of the society, and a comfortable maintenance for each individual; and whatever shall be acquired beyond this shall go to the common stock.  This *contract* provides for every member of the community, in sickness and in health, and under whatsoever misfortune may occur.

*Steinhauser,* 234 U.S. at 649-650 (quoting *Goesele v. Bimeler*, 55 U.S. 589, 606-07 (1852))(emphasis added).  The Ninth Circuit treated Jesuit vows in the same way in *Estate of Barry v. Commissioner*, holding that "by virtue of his taking the final oath of poverty and making the renunciations in connection therewith, in joining the Jesuit Order Father Barry entered into an *enforceable contract* that he would at least while a member of that Order transfer to it any property which he might receive, and that such an agreement would be enforceable in the civil courts."  *Estate of Barry v. Commissioner,* 311 F.2d 681, 684 (9th Cir. 1962) (cited by

Plaintiff at [Dkt. 64, at 5]). In *Cox v. Commissioner of Internal Revenue*, the Second Circuit was even more precise than the Ninth, stating that after the recipient of a bequest took his last vows as a Jesuit, he "could not acquire property except for the Order; any property then owned or later acquired would automatically become the property of the Order. And *under New York law, this contract was enforceable...." Cox v. C.I.R.*, 297 F.2d 36, 37 (2d Cir. 1961) (cited by Plaintiff at Dkt. 64, at 5) (emphasis added) ].

None of these cases recognize "federal common law" as the source for enforcing the obligations at issue. All of the cases expressly apply state contract law. And none of the cases address the relationship between such a contract and ERISA, because ERISA did not yet exist.

**B. ERISA Pre-Emption**

As Plaintiff's Count One is properly construed as attempting to enforce a contractual right, the question for the Court is whether an action for declaratory judgment based on state contract law is pre-empted by ERISA. The objective of ERISA, which was passed in 1974, is to:

> protect…participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to Federal courts.

29 U.S.C. § 1001(b). Therefore, ERISA regulates "employee benefit plan[s]," which the statute defines as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and

an employee pension benefit plan." *Id.* at § 1002(3). An "employee welfare benefit plan" is a plan that:

> …is maintained for the purposes of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .

*Id.* at § 1002(1). Except as otherwise provided in the statute, the term "employee pension benefit plan" means any plan:

> …which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that…[the plan]:
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

*Id.* at § 1002(2)(A).

ERISA explicitly indicates that it pre-empts state law addressing employee benefit plans:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). Plan trustees or fiduciaries are required to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

Common law actions are preempted by ERISA if the law "relates to" ERISA plans. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990). The

Supreme Court clarified that "[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . ., that 'reference' will result in pre-emption." *Gobeille v. Liberty Mutual Insurance Co.*, 136 S. Ct. 936, 943 (2016) (internal citation omitted); *see Franklin H. Williams Ins. Trust v. Travelers Ins. Co.*, 50 F.3d 144, 148 (2d Cir. 1995) (a claim under state law relates to an employee benefit plan if the law "has a connection with or reference to such a plan"). The Supreme Court expressly stated that ERISA can preempt state contract law. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62 (1987) (state law claim for breach of contract preempted by ERISA where it was "based upon common law of general application that is not a law regulating insurance"); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987) ("all suits brought by beneficiaries or participants asserting improper processing of claims under ERISA-regulated plans [should] be treated as federal questions governed by § 502(a)").[2]

To determine whether state law "relates to" an ERISA plan, the Court looks to "the objectives of the ERISA statute as a guide to the scope of the state law that

---

[2] ERISA's civil enforcement remedy for disputes by beneficiaries about the payment of plan benefits has especially strong preemptive force. *Aetna Health Inc., v. Davila*, 542 U.S. 200, 209 (2004). The civil enforcement provision creates a cause of action for "a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1). "Therefore, any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna,* 542 U.S. at 209 (2004). As Plaintiff likely qualifies as neither a "participant" nor a "beneficiary," Plaintiff is likely unable to take advantage of this remedy.

Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001). Not all actions for breach of contract which relate to employee benefits plans are preempted by ERISA. The "presumption against preemption is considerable" and "state laws of general application that merely impose some burdens on the administration of ERISA plans" are not preempted. *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. Howell Co., Inc.*, 126 F.3d 61, 67 (2d Cir. 1997). The preemption provision "does not require the creation of a fully insulated legal world that excludes these plans from regulation of any purely local transaction." *Hattem v. Schwarzenegger,* 449 F.3d 423, 430 (2d Cir. 2006). To exclude the plans in this way would create for them "a charmed existence that never was contemplated by Congress." *Id.*

Plaintiff's claim of a contractual right in Count One is preempted by ERISA because the cause of action clearly "acts upon" one of the most central features of an ERISA plan – whether the benefits will be paid according to the plan documents. *See* 29 U.S.C. § 1104(a)(1)(D) (fiduciary shall discharge her duties "in accordance with the documents and instruments governing the plan"). The Supreme Court's decision in *Egelhoff* is particularly instructive. In *Egelhoff*, the Supreme Court considered a Washington state statute that provided, in relevant part:

> If a marriage is dissolved or invalidated, a provision made prior to that event that relates to the payment or transfer at death of the decedent's interest in a nonprobate asset [to] . . .the decedent's former spouse is revoked…The nonprobate asset affected passes, as if the former spouse failed to survive the decedent[.]" Wash. Rev. Code § 11.07.010(2)(a)(1994)

*Egelhoff*, 532 U.S. at 144.  The statute defined "nonprobate asset" to include "a life insurance policy, employee benefit plan, annuity or similar contract, or individual retirement account."  *Ibid.* (quoting Wash. Rev. Code 11.07.010(5)(a)).

The Supreme Court found that this statute was preempted by ERISA.  The Court held that the nature and effect of the statute would intrude upon the intended scope of ERISA because, under the statute:

> Plan administrators cannot make payments simply by identifying the beneficiary specified by the plan documents.  Instead, they must familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been "revoked" by operation of law. And in this context the burden is exacerbated by the choice-of-law problems that may confront an administrator when the employer is located in one State, the plan participant lives in another, and the participant's former spouse lives in a third.  In such a situation, administrators might find that plan payments are subject to conflicting legal obligations.

*Id.* at 148-49.  This state of affairs is unacceptable because ERISA "binds…plan administrators to a particular choice of rules for determining beneficiary status."  *Egelhoff*, 532 U.S. at 147.

The issues created by the Province's contractual claim are analogous to those created by the statute at issue in *Egelhoff*.  Determining the validity of Fr. Cassem's beneficiary designation addresses "a central matter of plan administration."  *See Gobeille*, 136 S. Ct. at 943 (quoting *Egelhoff*, 532 U.S. at 148).  As in *Egelhoff*, a state law based on a separate existing legal arrangement would lead to the plan being administered according to standards besides those set forth by ERISA - the plan administrator would need to determine whether Fr. Cassem's vows created an enforceable contract and whether he maintained his membership in the Jesuits until the end of his life.  Furthermore, choice of law

issues arise because the Province is headquartered in Chicago, while Fr. Cassem took his final vows while in school in either St. Louis or Boston, made Tertianship in Omaha, lived in Boston for most of his career, and died in Connecticut.

Congress passed ERISA to protect a critical stream of income for retirees and their dependents. Congress emphasized the importance of this purpose in the statute:

> The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope an economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans…and that it is therefore desirable in the interests of employees and their beneficiaries….that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

29 U.S.C. § 1001(a). The statute is intended to protect beneficiaries relying on long-accumulated benefits from having to fight challenges to those benefits under disparate standards. Both the letter of the law and public policy lead the Court to conclude that the Province's claim for declaratory relief in Count One is pre-empted.

### C. ERISA Anti-Alienation Provision

Defendants argue that 29 U.S.C. § 1056(d), ERISA's "anti-alienation provision," prohibited Fr. Cassem from assigning his interest in the Accounts to the Province, through contract or otherwise. [Dkt. 58-1, 16-19]. Plaintiff does not address this argument in briefing except to argue that the anti-alienation provision fails strict scrutiny under RFRA. *See* [Dkt. 64, at 19]. Defendants are correct in stating that, for qualified pension plans, the anti-alienation provision

has few exceptions. *See* [Dkt. 58-1, at 16-17]. This reflects strong Congressional intent that administration of pension benefits should be uniform and the welfare of beneficiaries should be secure. The Supreme Court has opined that the anti-alienation provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them." *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990). As the claim in Count One is pre-empted by 28 U.S.C. § 1104(d), the Court need not resolve this question.

If the Court were required to rule on Plaintiff's motion based solely on a contradiction of the anti-alienation provision, the motion would likely fail because the Complaint does not sufficiently plead facts to allow the Court to determine whether the restriction on alienation applies. The statute provides: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d). The text of the statute includes the first limitation on the scope of the anti-alienation provision – the protection only applies to *pension* plans, not to other types of employee benefit plans. *See* 29 U.S.C. Sec. 1002(1) (defining "welfare plans") and Sec. 1002(2)(A) (defining "pension plans")' *see also Patterson,* 504 U.S. at 762-63. ("Pension plans that qualify for preferential tax treatment under 26 U.S.C. § 408 are specifically excepted from ERISA's anti-alienation requirement."). The second limitation is enumerated in the statute under 29 U.S.C. § 1051. This section lists 8 types of employee benefits plans that are covered by ERISA but are not subject to the

anti-alienation provision or any other provision contained in Subchapter I,

Subtitle B, Part 2 of the statute.  *See* 29 U.S.C. § 1051(1)-(8).  This section

excludes, among others, "employee welfare benefit plan[s]," plans maintained by

societies under 501(c)(8) or (9) of Title 26, individual retirement accounts or

annuities as defined under 26 U.S.C. § 408, retirement bonds under 26 U.S.C. §

409, or excess benefit plans.[3]  Plaintiff does not plead sufficient facts for the

Court to determine whether the Accounts are qualified "pension plans" or

whether they are exempted under 26 U.S.C. § 1051.

### D. The Religious Freedom Restoration Act

Plaintiff argues that ERISA preemption violates the Province's rights under

the Religious Freedom Restoration Act (RFRA).  [Dkt. 64, at 12-23].  Defendants

argue that RFRA does not apply to this case because it is between private parties.

[Dkt. 70, at 10-12].  This Circuit's precedent is unclear as to whether RFRA can

apply when the government is not a party and the law is enforceable only by

private parties.  However, even assuming RFRA applies, ERISA does not impose

a "substantial burden" on the Province's exercise of religion.

The Religious Freedom Restoration Act states:

> (a) In general. Government shall not substantially burden a person's exercise
> of religion even if the burden results from a rule of general applicability,
> except as provided in subsection (b).

> (b) Exception. Government may substantially burden a person's exercise of

---

[3] Contributing to the Court's inability to answer this question is Defendants
characterization of the Accounts as "employee welfare benefit plans," which are
expressly exempt from anti-alienation protection under § 1051.  *See* [Dkt. 58-1, at
7].

religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.  The statute further provides a remedy for judicial relief, stating, in relevant part:

(c) Judicial Relief.  A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

*Id.*  As a religious nonstock corporation, RFRA applies to the Province.  *See Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 752-753 (2014) (Ginsburg, J., dissenting) ("The First Amendment's free exercise protections, the Court has indeed recognized, shelter churches and other nonprofit religious-based organizations."); *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 188 (2012) (holding that the Free Exercise Clause protects a religious group's right to choose its own minister rather than having one appointed by the state).

### i.    *Applicability of RFRA*

There is no binding Second Circuit precedent that requires applying RFRA to cases between private parties when the government is not a party.  The text of the statute lends itself to the interpretation that the Government must be taking some action in order for RFRA to apply: "Government shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  The statute also states that individuals can obtain relief "against a government."  *Id.* at §2000bb-

1(c).  The Second Circuit opined on, but did not decide, the issue in *Rweyemamu v. Cote*, stating:

> [W]e think that the text of RFRA is plain, …in that it requires *the government* to demonstrate that application of a burden to a person is justified by a compelling governmental interest.  *See* 42 U.S.C. § 2000bb-1(b)…Thus, we do not understand how it can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue…Second, there are strong policy reasons not to apply RFRA to an action by a private party seeking relief against another private party.  RFRA does not apply to state law…Thus, disparate treatment of federal and state-law claims is assured – consideration of the former under RFRA and the latter under *NLRB v. Catholic Bishop*, 440 U.S. 490 (1979).

*Rweyemamu v. Cote*, 520 F.3d 198, 203 n. 2 (2d Cir. 2008) (some internal citations omitted).  This Court finds that analysis persuasive.  It is difficult to conceive of how Congress intended the government to "demonstrate that application of a burden to a person is justified" if the government is not a party and, therefore, cannot produce evidence to "demonstrate" such a justification.  *See Hankins v. Lyght*, 441 F.3d 96, 114-15 (2d Cir. 2006) (Sotomayor, J., dissenting).

Dicta in *Hankins v. Lyght* support the interpretation that "RFRA's language certainly seems broad enough to encompass [a private action between private parties]," but the Court of Appeals expressly declined to answer the question.  *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) ("We need not, however, decide whether the RFRA applies to a federal law enforceable only in private actions between private parties.").  The Court in *Hankins* held that RFRA could be used as a defense because the claim under the statute at issue, the Age Discrimination in Employment Act of 1967 (ADEA), could have been brought by the federal Equal Employment Opportunity Commission (EEOC) instead of the private plaintiff who

**did bring suit.** *Id.* **("The ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's provisions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party.")**

The Province argues that because the Employee Benefits Security Administration (EBSA), like the EEOC, was created as part of a federal statutory scheme to enforce provisions of a statute (namely ERISA), *Hankins* binds this Court to apply RFRA. [Dkt. 73, at 6-7]. The existence of the EBSA is beside the point. This action involves no attempt to implement or enforce ERISA. The EBSA could not conceivably be a plaintiff or a defendant in this lawsuit. In *Hankins* the Court examined whether RFRA could be asserted as a *defense* by a church in a lawsuit attempting to enforce the ADEA. *See Hankins*, 441 F.3d at 103 (holding that "the RFRA's decisions are directly on point, and allow parties who, like appellees, claim that a federal statute, like the ADEA, substantially burdens the exercise of their religion to assert the RFRA *as a defense to any action* asserting a claim based on the ADEA") (emphasis added). It was not the holding in *Hankins* that RFRA should be applied in all actions between private parties under any circumstance in which a federal law is incidentally implicated and provisions of that law can be enforced by a federal agency.

To the extent that binding precedent supports an interpretation of RFRA as applying to cases between private parties, the statute only applies when used as a defense to an attempt to enforce a federal statute (as in *Hankins*) or as a cause of action to challenge a statute (as in *Hobby Lobby*.) In contrast, whether or not the statute can apply to cases between private parties, RFRA certainly cannot be

used as a procedural mechanism to legitimize a cause of action that contravenes federal law for a plaintiff that is contesting dismissal. Such a broad scope would allow almost any natural person, closely held corporation, or religious organization to invoke RFRA as a sword in litigation when the outcome of a motion to dismiss or motion for summary judgment could disfavor the RFRA-invoking party.

### ii.    *Substantial Burden*

In any event, even if RFRA is applicable in the present case, it does not preclude ERISA preemption because ERISA does not impose a "substantial burden" on Plaintiff's free exercise of religion. Plaintiff argues that the burden is substantial because "Defendants would use ERISA to deprive the Province of its freedom to advance the purposes and intents of Jesuit religious practices, namely, to have its members renounce their worldly possessions for all time so as to enable their members to fully devote themselves to others." [Dkt. 64, at 18]. The Court disagrees. Any burden on the Province's exercise of religion is not imposed by ERISA, it is imposed by Fr. Cassem's designation of Defendants as beneficiaries. *See* [Dkt. 44, at ¶ 22]. ERISA's provisions do not prevent the Province from requiring vows of its members, using its members' resources to further its charitable purpose, distributing property on behalf of its members, accepting property from its members, or expelling members who do not honor their vows.

In this context, ERISA does not create the burden on the Province's exercise of religion – the statute merely fails to provide a vehicle for the Province to address potential nonconformity with its vows. A useful analogy is the circumstance that would exist if the Accounts were promissory notes rather than ERISA accounts. If Fr. Cassem had sold promissory notes to a "holder in due course" as defined in UCC § 3-302(1), the holder in due course would be entitled to payment from the maker and guarantor of the notes, regardless of any claims the Province would have against Fr. Cassem based on a prior contractual relationship. *See, e.g. A. I. Trade Finance, Inc.*, 41 F.3d 830 (2d Cir. 1994). Surely it could not be said, in that scenario, that the UCC is a "substantial burden" on Plaintiff's exercise of religion. Conversely, in the case at bar the dispute is between the Province and Defendants. ERISA is only incidentally implicated.[4]

The Province essentially asks the Court for specific performance of Jesuit vows; it asks the ERISA plan administrator to disregard plan documents and distribute plan assets to the Province instead of to the designated beneficiary, as if Fr. Cassem had himself maintained the Province's designation in accordance with his alleged contract. Holding that such a claim to employee benefits is preempted by ERISA does not substantially burden the Province's exercise of religion. The only avenue unavailable to the Province is declaratory judgment based on the underlying contract. If Fr. Cassem violated the terms of the contract when he changed the beneficiary designation, the Province is free to pursue

_____

[4] The intellectual contortion required to frame ERISA as the "burden" in this scenario illustrates the absurdity of applying RFRA to all cases between private parties.

claims for damages related to that contract, either against the estate or against Defendants. *See, e.g. Stevenson v. Bank of New York Co., Inc.*, 609 F.3d 56 (2d Cir. 2010) (ERISA did not preempt claims by an employee that employer's decision to discontinue certain benefits plans violated labor contract). It cannot be the case that Congress intended RFRA to require courts to suspend the application of a general law in this fully private dispute between an organization and its member.

### E. Declaratory Judgment

Defendant brings this action under the Declaratory Judgment Act (DJA). *See* 28 U.S.C. §§ 2201, 2202. Under the DJA, a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in a "case of actual controversy." 28 U.S.C. § 2201(a). An "actual controversy" must be "real and substantial…admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *E.R. Squibb & Sons, Inc., v. Lloyd's & Companies*, 241 F.3d 154, 177 (2d Cir. 2001) (quoting *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993)). The Court does not disclaim jurisdiction over Count One, as the dispute over the validity of the beneficiary designation is an "actual controversy." [5]

---

[5] Even in the event that the Province were able to plead facts supporting a cause of action based on a contractual right, the Court may decline to enter declaratory judgment. District Courts have "a unique breadth of … discretion to decline to enter a declaratory judgment." *E.R. Squibb*, 241 F.3d at 154 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)). When deciding whether to allow an

## V.    Conclusion

Plaintiff does not sufficiently plead facts to sustain the claim in Count One and Count Four for declaratory judgment based on a contractual right. Defendants did not challenge Counts Two and Three.  Therefore, Count Two and Count Three remain active.  Defendants Motion to Dismiss Counts One and Four is GRANTED.

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 18, 2019

---

action for declaratory judgment, the Court should consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc., v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir. 2005).  The Court must also look to "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata;' (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." *Dow Jones & Co. v. Harrod's Ltd.,* 346 F.3d 357, 359-60 (2d Cir. 2003).