## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **WISCONSIN PROVINCE OF** | : | |
| **THE SOCIETY OF JESUS** | : | |
| **Plaintiff,** | : | **No. 3:17-cv-01477 (VLB)** |
| | : | |
| **v.** | : | |
| | : | **September 14, 2020** |
| **AUDREY V. CASSEM, ET AL.** | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DKT. 135

Before the Court is Defendants Audrey Cassem and Thomas F. Owens's ("Defendants") Motion for Summary Judgment [Dkt. 135] in the case brought by Wisconsin Province of the Society of Jesus ("Plaintiff" or the "Province") over the late Rev. Edwin H. "Ned" Cassem, M.D., S.J.'s ("Fr. Cassem") designation of the Defendants as the beneficiaries of two ERISA-qualified retirement accounts. *See generally*, [Dkt. 44 (Am. Compl.)].[1] The Province alleges that Fr. Cassem's January 11, 2011 beneficiary designation is invalid due to incapacity or undue influence. [*Id.* at ¶¶ 39-48]. The Defendants move for summary judgment arguing that Plaintiff

---

[1] The Amended Complaint [Dkt. 44] also claimed that Fr. Cassem could not have designated Mrs. Cassem and her son, Mr. Owens, as beneficiaries because Fr. Cassem did not own the accounts because his Jesuit vows required him to renounce any and all property owned or subsequently acquired. *Id.* ¶ 33. The Court dismissed Count 1 and 4 because the Province's breach of contract claim for specific performance is preempted by ERISA and precluded by ERISA's anti-alienation provision. [Dkt. 74], reported at *Wisconsin Province of Soc'y of Jesus v. Cassem*, 373 F. Supp. 3d 378, 383–92 (D. Conn. 2019).

cannot present enough admissible evidence showing a genuine dispute as to Fr. Cassem's capacity or whether he was subject to undue influence and that they are entitled to judgment as a matter of law.  For the following reasons, the Court GRANTS in part and DENIES in part the Defendants' motion for summary judgment.

## Factual Background

Before discussing the background of this matter, the Court makes an observation. The task before the Court is formidable, requiring the objective inquiry into Fr. Cassem's mind on one day, nearly a decade ago. The litigation pits the religious order that Fr. Cassem belonged to for sixty years against his late brother's widow and her son. It is a difficult case but ultimately one that the Court must resolve because it is within the Court's jurisdiction.[2] If Fr. Cassem had the requisite mental capacity to execute the beneficiary designation and it was a product of his free will, his reasoning for doing so is immaterial.

---

[2] **The Court considered** *sua sponte* **whether the probate exception to diversity jurisdiction deprives the Court of subject matter jurisdiction. See** *Marshall v. Marshall*, **547 U.S. 298 (2006). The Court concludes that the probate exception is inapplicable. The IRAs at issue are non-probate assets. This action involves a discrete issue and would not "(1) interfere with probate proceedings, (2) assume general jurisdiction of the probate, or (3) assert 'control of property' in the custody of the state court."** *Estate of Genecin ex rel. Genecin v. Genecin*, **363 F. Supp. 2d 306, 311 (D. Conn. 2005)(holding probate exception to diversity jurisdiction inapplicable to court's adjudication of brother's dispute regarding rightful ownership of deceased mother's IRA since IRA was not a probate asset;** *compare to Newcomb v. Sweeney*, **No. 3:11CV399 VLB, 2013 WL 1774651, at \*1 (D. Conn. Apr. 25, 2013) (Bryant, J)(dispute over IRA beneficiary determination remanded where suit commenced in probate court, then appealed to superior court, thus the superior court maintained probate jurisdiction pursuant to Conn. Gen. Stat. § 45a-98). The Court also has original jurisdiction over the action pursuant to 28 U.S.C. § 1331 because the action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1451.**

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. For ease of reference, exhibits will refer to evidentiary exhibits included with the Defendants' Motion for Summary Judgment [Dkts. 136-1 (Def. Exs. 1-9), 136-2 (Def. Exs. A-G), and Dkt. 136-3 (Def. Exs. H-L)] and Plaintiff's Opposition [Dkt. 150] by exhibit identification only, i.e. [Def. Ex. A] and [Pl. Ex. 1]. Citation to the Defendants' D. Conn. Civ. L. R. 56(a) statement is applicable only where the parties agree as to the fact stated.[3]

a. <u>Introduction</u>

Fr. Cassem was a Jesuit-member of the Province. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 2]; [Pl. Ex. 2 (N. Cassem Final Vows in English, 12/26/1985)].[4] He was

---

[3] Defendants' motion fails to comply with Chambers Practices stating that: "When exhibits are filed in conjunction with a dispositi[ve] motion, the exhibits must be listed and described in a corresponding table of contents. The table of contents detailing the exhibits should itself be the first exhibit. <u>Each exhibit must be filed as a separate attachment and must be filed in an OCR text-searchable PDF format</u>." [Dkt. 7 at 4] (underlining and bold in original). These rules are necessary to expedite the retrieval of relevant exhibits and aid in the prompt disposition of pending motions. The failure to comply with these rules unnecessarily taxes the Court's resources and delays disposition of the related motion. The Defendants did not file a table of contents and the exhibits were filed in three composite filings, identified with both letters and numbers, and were not OCR-enabled. In all future matters, the Court will return any filings that do not comply with Chambers Practices and order briefing to establish good cause to refile exists.

[4] The Court declines to consider Pl. Ex. 1, which purports to be Fr. Cassem's vows from 1955 because the document is in Latin and the Province does not provide a certified English translation. It is well established that foreign language materials are inadmissible in the absence of an English translation certified to be true and accurate. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *Masri v. Thorsen*, No. 17-CV-4094 (KMK), 2020 WL 1489799, at *3 (S.D.N.Y. Mar. 27, 2020)("Translations of foreign-language documents which are not

an esteemed psychiatrist practicing at Massachusetts General Hospital ("MGH"), where he served as the Chief of the Psychiatry Department for over a decade. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 3]; [Pl. Ex. 5 (Province Death Announcement, 07/07/2015)]. In addition to his clinical work, he was a professor of medicine at Harvard Medical School. [*Id.*].

Fr. Cassem acquired two retirement accounts in his capacities as a psychiatrist and professor. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 3]; *see also* [Dkt. 51 (Answer of TIAA CREF) ¶¶ 64-65]. Fr. Cassem executed a beneficiary designation in 1976 naming the Province as the recipient of the retirement accounts. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 3]; [Pl. Ex. 12 (TIAA beneficiary form, 08/25/1976)]. While practicing medicine and teaching, Fr. Cassem resided at the Jesuit community in Weston, Massachusetts until Christmas of 2011. [Pl. Def. D. Conn. Civ. L. R. 56(a)2(ii) statement ¶ 10].

### b. Fr. Cassem and his practice at MGH

The Province presents evidence showing that the scope of Fr. Cassem's medical practice was curtailed by MGH out of concern over his judgment. Gregory Fricchione, M.D., who was then Chief of the Psychiatry Department, testified that he observed Fr. Cassem act "inappropriately" at a fellowship dinner after becoming intoxicated, sometime in 2008 or 2009. [Pl. Ex. 7 (Fricchione Depo.) 26:01-27:04]. The incident caused Dr. Fricchione to initiate a peer review investigation into Fr. Cassem's fitness to continue to practice medicine at MGH. [Pl. Ex. 7 (Fricchione

certified as true and accurate translations and which do not even identify the translator are not properly authenticated and are not admissible evidence.")

Depo.) 40:01-40:07]. Dr. Fricchione testified that before a clinician's medical privileges are revoked, MGH gives physicians the opportunity to voluntarily relinquish their privileges. [Pl. Ex. 7 (Fricchione Depo.) 50:09-50:24]. While expressing admiration for Fr. Cassem, Dr. Fricchione also testified that he became "coarser" and "caustic." [Pl. Ex. 7 (Fricchione Depo.) 110:01-110:22]. As the peer review process concluded or was coming to a conclusion, Dr. Fricchione was tasked with suggesting that Fr. Cassem, his former mentor, relinquish his medical privileges at MGH. [Pl. Ex. 7 (Fricchione Depo.) at 146:11-147:24]. Eventually, Fr. Cassem agreed and his privileges were reduced to either "Honorary Staff" or "Courtesy Staff," meaning that he could no longer admit patients or prescribe medications at MGH. [Pl. Ex. 7 (Fricchione Depo.) 42:06-42:25](explaining that Fr. Cassem remained employed after the peer review proceeding); [Pl. Ex. 24-25, MGH Prof. Staff Bylaws §§ 2.03.3, 2.03.09].

The parties disagree over the scope of Fr. Cassem's clinical or teaching duties at MGH from 2010 through Christmas of 2011. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 6]. The parties agree that Fr. Cassem was "present" at MGH in 2010 and periods of 2011 and the Province did not refute Defendant's assertion that Fr. Cassem maintained at least a mentorship and physician training role. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 6]. The Province's financial records show that Fr. Cassem's monthly salary remittance to the Jesuits decreased from $10,906 in September 2010 to $2,444 in October 2010. [Pl. Ex. 14 (Cassem Income and Expenses spreadsheet)].

Barbara McManus, Fr. Cassem's administrative assistance since the 1990's, testified that he worked, "pretty much full days" and assisted with overflow calls, training new physicians, and taking calls from colleagues. [Def. Ex. C. (McManus Depo.) 151:04-154:22, 154:01-158:25, 201:01-203:12].  The Defendants argue that Fr. Cassem "also maintained a small private practice during this period," but Ms. McManus's cited deposition testimony makes no reference to Fr. Cassem continuing to maintain a small private practice. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 6](citing to Def. Ex. C (McManus Depo.) 201:10-20, 203:12]. However, Defendant's Exhibit 6 is a January 18, 2011 letter from Ms. McManus to an insurance intermediary stating that "Dr. Cassem wishes to apply for medical malpractice insurance. He has a very small private practice but needs insurance because of some occasional contact with some long-standing patients."

The Defendants do not explain the scope of Fr. Cassem's clinical or mentoring activities after his privileges were reduced in 2010. The insurance coverage application is not necessarily indicative of whether Fr. Cassem continued to practice psychiatry because the scope of his clinical duties is unknown, although he stated in the application that he only saw patients occasionally. The Defendants do not establish that such coverage was ever placed and whether the coverage was intended to address future clinical encounters or whether it was "tail" coverage for claims arising prior to the termination of his privileges. The parties agree, however, that Fr. Cassem's functional relationship at MGH ended over Christmas 2011 once he relocated to Audrey Cassem's home in West Hartford, Connecticut. [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 6]. Fr. Cassem formally

remained on MGH's medical staff until February 2012, over a year after the beneficiary designation change. [Pl. Ex. 4 (A. Cassem Depo.) at 27:01-27:13]; [Pl. Ex. 37 (Fr. Cassem Retirement Ltr., 02/06/2012)].

### c. Medical information and observed behaviors

Medical records memorialize that Fr. Cassem was evaluated by MGH neurologists in January 2000 and again in October 2001 because of behavioral changes, including, increased irritability, forgetfulness, disorganization, disinhibition and hypomanic symptoms, although the original records from these baseline assessments are either no longer available or are not presented by the parties. [Pl. Ex. 19 (Neuropsychology Reevaluation, 05/25/2010)].

In 2008, Fr. Cassem began taking Fluoxentine. [Pl. Ex. 26 (Walgreens Data). The Province argues that he was taking the medication without a documented diagnosis of depression or anxiety, however, they do not cite evidence showing the absence of a diagnosis or suggesting that Fr. Cassem was self-medicating.  Of note, the pharmacy data shows that the prescription was issue by G. Murray of MGH, which appears to refer to Fr. George Murray, who was also a Jesuit and a psychiatrist.  *See*  [Pl. Ex. 7 (Fricchione Depo.) 26:01-26:25, 154:06-154:17](referencing Fr. Murray).

In 2009, Fr. Cassem was involved in a car accident. [Pl. D. Conn. Civ. L. R. 56(a)(2)(ii) ¶ 55]. Two women who were suing Fr. Cassem over injuries related to the accident sent a letter to Mrs. Cassem and several Jesuits upon learning of his death, claiming that he admitted that he fell asleep while driving. [Pl. Ex. 26 (S.

Gersten production, 07/12/2015 Ltr. From Marilyn and Lisa Jacobs)]. The Province offers no evidence corroborating the circumstances or the severity of any purported automobile accident. The Defendant's reply brief states that this litigation ended in a defense verdict but does not cite a source for this assertion. [Dkt. 159 (Def. Repl. Br.) at 16].

In February 2010, Fr. Cassem was evaluated by MGH neurologist John Growdon, M.D. for forgetfulness. [Pl. Ex. 29 (Patient Note, 02/23/2010)]. Dr. Growdon's note indicates that Fr. Cassem presents with occasional word-finding difficulty, but that he was always oriented to time, day, and date and maintained active work and recreation schedules and is independent in personal hygiene. [*Id.*]. On the neurological examination, there were three errors out of 37 on the Blessed Dementia Scale and his Hachinski Ischemic Scale Score was 3. [*Id.*]. Dr. Growdon diagnosed him with MCI (Mild Cognitive Impairment), Grade II, CDR .05. [*Id.*].

At Dr. Growden's direction, Fr. Cassem underwent an MRI and neuropsychological re-evaluation in April and May 2010, respectively. [Pl. Ex. 19 (Neuropsychology Reevaluation, 05/25/2010)]. The MRI imaging showed that the volume loss in his brain progressed since 2001. [*Id.* at 1]. Fr. Cassem missed his first appointment because he could not locate the building at MGH and failed to call after he got lost. [*Id.* at 2]. When he arrived for the rescheduled appointment, he inadvertently brought medical notes from another patient and forgot the name of the common anti-depressant that he was taking for years. [*Id.* at 2]. The evaluating psychologist concluded that Fr. "…Cassem's performances on cognitive measures across a range of domains generally falls at or above the average range," except

for certain memory functions. [*Id.* at 6]. The psychologist concluded that testing was not suggestive of "AD" (Alzheimer's disease), but that the progressive cognitive decline was suggestive of MCI. [*Id.*]. As to the brain imaging, she noted that "the biparietal volume loss observed in the recent MRI is of concern as studies have found a higher rate of converters from MCI to AD in individuals with biparietal involvement," meaning a heightened risk of Alzheimer's disease.   [*Id.*]. The psychologist recommended that "his involvement and care of patients be carefully supervised and monitored and that he not be directly responsible for patient treatment decisions," but was uncertain of whether he was treating patients or whether he was teaching residents or fellows. [*Id.*].

Fr. Cassem returned to Dr. Growden on January 3, 2011, accompanied by Dr. Michael Jenike, his friend and a fellow MGH psychiatrist. [Pl. Ex. 39 Patient Note, 02/23/2010)]; *see* [Pl. Ex. 44 (Jenike email to Fr. Cassem, 04/09/2011)](referring to Fr. Cassem as his "mentor and good friend of over 30 years."). The activities of January 3, 2011 are especially significant because Fr. Cassem changed his beneficiary less than a week later. According to Dr. Growdon's note, "Dr. Cassem believes things are unchanged: there is still forgetfulness but he is functionally independent in daily routine as well as personal hygiene. He drives a car without getting lost. As discussed earlier this year, he does not see patients or write prescriptions. This summer he resigned from his duties on the board of Creighton University in Nebraska." [Pl. Ex. 39 (Patient Note, 01/03/2010)]. Dr. Growdon reached the same diagnosis, MCI, Grade II, CDR 0.5. [*Id.*]. But his cognitive abilities were continuing to deteriorate and his Blessed Dementia Score increased from a 3

to an 8 over the year. [*Id.*]. "Because of his mounting mental status scores, [Dr. Growden] prescribed Aricept, 5 mg. h.s. [at bedtime]." [*Id.*].

Dr. Growdon explained that Fr. Cassem met the criteria for "mild cognitive impairment; that is to say, someone with a subjective complaint of forgetfulness and having that validated on a cognitive test, but at that time, falling well short of dementia. In other words, MCI implies there is no dementia." [Def. Ex. K. (Growdon Depo.) 45:10-45:18]. Dr. Growdon testified that he had no concerns with Fr. Cassem's ability to execute an informed consent document, a health care proxy form, or manage his own financial affairs. [Def. Ex. K. (Growdon Depo.) 88:04-88:18]. He also testified that, given Fr. Cassem's rate of cognitive decline, he was worried that Fr. Cassem was "beginning to hit the skids here" and prescribed him Aricept. [Def. Ex. K. (Growdon Depo.) 92:01-93:22].

The same day, Fr. Cassem executed a Massachusetts Health Care Proxy form naming Dr. Jenike as his Health Care Agent and Dr. Fricchione as his alternate agent, witnessed by Ms. McManus and Judith Byford, another MGH employee. [Def. 56 [Def. Ex. 4 (Health Care Proxy form, 01/03/2011)]. The parties dispute the essential facts concerning the execution of the healthcare proxy form. *Compare* [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 10]; [Pl. Resp. to Def. 56(a) statement ¶ 10].

The Defendants argue that "Dr. Jenike, Dr. Fricchione and Ms. McManus all testified that they would not have signed the health care proxy form if they had any concern or doubt that Ned Cassem did not have the requisite mental capacity to understand and execute that document." [Def. D. Conn. Civ. L. R. 56(a) statement

10

¶ 10]. In reply, the Province argues that Dr. Fricchione testified that he does not remember being designated as Fr. Cassem's alternate health care proxy. [Pl. Resp. to Def. 56(a) statement ¶ 10]. The Province argues that Dr. Jenike's testimony as to the health care proxy form is inconsistent and that neither he nor Ms. McManus recall observing anyone else execute the form. [*Id.*].

The Court is unable to draw any conclusions about Dr. Fricchione's testimony as to the health care proxy form because the portions of the transcript the parties cite were not included with their filings: Defendant cites Dr. Fricchione's answer to a question but omits the full question itself and Plaintiff does not include the portions of the deposition they cite.

As to Dr. Jenike, when he was asked whether he had "…any concern at the time that Dr. Cassem did not understand and have the ability to make a decision to designate a health-care proxy," Dr. Jenike replied that he did not and that Fr. Cassem "fully understood." [Def. Ex. D (Jenike Depo.) 126:12-126:16]. But, Dr. Jenike testified that he did not recall whether there were any concerns about Fr. Cassem's cognitive abilities, he did not recall whether he was given any of his medical records to review, and that he assumed that he had a conversation with Fr. Cassem about his wishes if he had gotten sick but could not recall that either. [Def. Ex. D (Jenike Depo.) 24:01-24:23]. Dr. Jenike attended Fr. Cassem's appointment with Dr. Growdon and was aware of his specific diagnosis but concluded that Fr. Cassem would not have had difficulty understanding the document and noted that he also purchased an automobile around this time. [Def. Ex. D (Jenike Depo.) 122:02-122:15]. Dr. Jenike assisted Fr. Cassem with

11

purchasing this vehicle on January 29, 2011, after the health care proxy form was executed. [Pl. Ex. 42 (Jenike Depo.) 117:03-11:08]; [Def. Ex. 7 (Motor Vehicle Purchase Agreement, 01/29/2011)].

At Fr. Cassem's next appointment with Dr. Growdon in March 2011, two months after the beneficiary designation, he reported feeling well and his Blessed Dementia Score improved slightly. [Def. Ex. M-5 (Patient Note, 03/17/2011)]. Dr. Jenike attended this appointment with Fr. Cassem and confirmed that Fr. Cassem was driving his new car safely. [*Id.*]. Fr. Cassem returned to Dr. Growdon, again accompanied by Dr. Jenike, in July 2011 and his condition was reported to be stable. [Def. Ex. M-6 (Patient Note, 07/28/2011)]. However, in July 2011, Dr. Jenike was assisting Fr. Cassem with his medication regimen. [*Id.*].

These two visits do not reference Dr. Jenike's concerns over Fr. Cassem's unsafe storage and handling of firearms or the results from a driving assessment conducted by the Jesuits. Dr. Jenike testified that he was concerned about an "extremely dangerous situation" because he observed loaded and cocked firearms left on Fr. Cassem's desk at the Jesuit center. [Pl. Ex. 42 (Jenike Depo.) 54:01-54:18]. Notably, Dr. Jenike testified that Fr. Cassem voluntarily permitted Dr. Jenike to remove his firearms, notwithstanding the fact that Fr. Cassem was passionate about firearms and the Second Amendment. [Pl. Ex. 42 (Jenike Depo.) 54:07-54:10, 54:13-54:18]("I'm sure it took quite a conversation, as he or George [Murray] giving up their guns was like giving up their right arm, but he let me do it."… "Yes. I mean, I didn't take them. He willingly gave them to me.").

After Dr. Jenike removed the firearms, Fr. Cassem forwarded an email to Defendants Thomas Owens and Audrey Cassem and to Dr. Jenike with the subject line "Woman Nearly Killed by Criminal Safe Zone," accompanied by commentary from Fr. Cassem. [Pl. Ex. 44 (Email chain, 04/09/2011)]. The email contains some vulgar language and asks Dr. Jenike to return one of his concealed carry pistols. [Pl. Ex. 44 (Email from Fr. Cassem, 04/09/2011)]. Fr. Cassem's first email concludes with "Father Nedly (sic), so kind that he wants to give all scumbag murderers a sudden chance to choose repentened (sic) so they see their God before they DIE (bold)." In responding to Dr. Jenike's email expressing concern over Fr. Cassem's safety, Fr. Cassem's email was disjointed and addressed consoling patients, describes a crime that he read about, and chastises Dr. Jenike for threatening to "lock up all my firearms." [Pl. Ex. 44 (Fr. Cassem repl. to Jenike, 04/09/2011)]. Dr. Jenike replied that he "will let Tom and Audrey know that we have discussed this because they both care for you so much." [Pl. Ex. 44 (Jenike repl. to Fr. Cassem, 04/09/2011)].

In May 2011, Fr. Cassem underwent a routine clinical driving evaluation at the behest of the Jesuits. [Pl. Ex. 11 (Romano driving assessment, 05/09/2011)]. The evaluator, an occupational therapist, recommended that Fr. Cassem retire from driving and "that Fr. Cassem is at risk for making errors with work tasks, medication management, financial management, judgment, way finding and other complex cognitive challenges." [*Id.*]. The occupational therapist wrote that his speech was tangential, "almost stream-of-consciousness, by the end of our meeting." [*Id.*]. She was concerned that Fr. Cassem had poor insight into his own

impairment and judgment. [*Id.*]. Myles Sheehan with the Jesuits addressed these concerns with Dr. Jenike but neither appear to have taken any further action on the issue. [Pl. Ex. 11 (Sheehan email re: Fr. Cassem, 05/25/2011)]("I described the interaction of Fr. Cassem and Ms. Romano, Fr. Cassem's inappropriate references to guns, the ongoing outbursts at Campion regarding the driving evaluation, and the like and expressed my concern regarding Ned and driving, Ned and guns, and the like."); *see also* [Def. D. Conn. Civ. L. R. 56(a) statement ¶ 23].

Dr. Growdon testified that he was unaware of both Dr. Jenike's intervention regarding Fr. Cassem's firearms and the Jesuit's driving evaluation. [Pl. Ex. 28 (Growdon Depo.) 145:13-147:22]. As to the driving assessment he was "a little surprised, because this was done when? May 2011. In March, Michael Jenike says he got a new Honda, drives safely and—well…Nothing like having data." [Pl. Ex. 28 (Growdon Depo.) 146:14-146:19].

Fr. Cassem relocated to West Hartford around Christmas in 2011. The last medical record is dated March 23, 2012. [Def. Ex. M-7 (Patient note, 03/23/2012)]. Dr. Growdon diagnosed him with "Probable Alzheimer's Disease, CDR 1.0, Grade III," as his disease progressed. Mrs. Cassem was assisting with his medications and his BDS score doubled. [*Id.*]. Sadly, Fr. Cassem died of Alzheimer's Disease at Mrs. Cassem's house on July 4, 2015. [Pl. Ex. 15 (Death Certificate)].

### d. Execution of the beneficiary designation and Fr. Cassem's move to West Hartford

Defendant Audrey Cassem is the widow of Fr. Cassem's late twin brother, John, who died in 2009. See [Pl. Ex. 33 (Province announcement of J. Cassem's death,

08/27/2009)]. John's death devastated Fr. Cassem. [Def. Ex. C. (McManus Depo.) 128:04-129:02]. Fr. Cassem began visiting Mrs. Cassem at her home in West Hartford with increased frequency after John's death. [Def. Ex. C. (McManus Depo.) 128:04-129:02]. Mrs. Cassem testified that, between the end of 2010 and his relocation to her home over Christmas in 2011, Fr. Cassem usually spent every other weekend at her home, often coming on Thursdays. [Pl. Ex. 50 (Cassem Depo.) at 56:17-56:18, 258:3-258:05].

Mrs. Cassem testified that, after John died, she met with her son Thomas Owens to review finances. [Pl. Ex. 4 (Cassem Depo.) at 55:25-57:09]. Fr. Cassem was visiting the home for a family celebration and spoke with Mrs. Cassem about her meeting with her financial advisor earlier that day. [Pl. Ex. 4 (Cassem Depo.) at 56:04-56:20]. Mrs. Cassem told him that the meeting went well, but "…the house is expensive. It has a lot of upkeep and taxes are high. So we may have to make a little change. But we'll always have a room for you. We just may have to sell our home, we don't know." [Pl. Ex. 4 (Cassem Depo.) 56:19-56:24]. In response, Fr. Cassem, "put his fist down. He said, 'I have plenty of money,'" and stated his intention of retiring to Mrs. Cassem's home. [Pl. Ex. 4 (Cassem Depo.) 56:24-56:57].

The Defendants also provide an affidavit from Justine Tobis, a retired probate judge, averring that she recalls a conversation with Fr. Cassem over the weekend of October 23-24, 2010, where he discussed his intentions to relocate to Connecticut. [Def. Ex. 1 (Tobis Aff.) ¶ 8]. Judge Tobis stated that Fr. Cassem told her that she intended to name Mrs. Cassem and Mr. Owens as his beneficiaries and that he was lucid and clear about his intentions. [Def. Ex. 1 (Tobis Aff.) ¶¶ 9-10].

15

Mrs. Cassem is close friends with Attorney Sandra Gersten. [Pl. Ex. 3 (S. Gersten Depo.) 9:01-09:12,].[5] Fr. Cassem met Ms. Gersten through Mrs. Cassem and his late brother and would occasionally attend Jewish holidays with them. [Pl. Ex. 3 (S. Gersten Depo.) 9:12-10:02, 14:02-15:01]. Ms. Gersten represented Mrs. Cassem in a variety of issues and on a continuing basis since the early 2000's. [Pl. Ex. 3 (S. Gersten Depo.) 15:02-15:07, 17:07-17:10]. Ms. Gersten testified that Fr. Cassem called her towards the end of 2010 to seek representation to draft a power of attorney, a will, and for help with withdrawals from TIAA-CREF, as he would no longer have Boston-area attorneys through MGH. [Pl. Ex. 3 (S. Gersten Depo.) 20:14-21:10]. Ms. Gersten's billing records reflect that she met with Fr. Cassem on October 28, 2010 and again on November 26th and 29th. [Pl. Ex. 32 (S. Gersten billing records, 12/01/2010 inv.)].

Attorney Gersten testified that Fr. Cassem desired to take care of his sister-in-law and family and did not want to leave anything for the Province. [Pl. Ex. 4 (S. Gersten Depo.) 143:11-144:21, 145:21-146:05]. In addition to changing the beneficiary on his retirement account, Fr. Cassem also sought to obtain money from the Cassem Family Trust established by Fr. Cassem's father, specifically, he wanted to accumulate the assets so they could be included as part of his estate so that he could direct the disposition of funds through his will. [Pl. Ex. 4 (Cassem Depo.) 143:14-145:21, 156:03-156:12]. The trust instrument [Pl. Ex. 7 (Trust Agreement, 08/18/1961)] provides that the Province is the beneficiary of the trust,

---

[5] Because the Defendants are represented by Attorney Peter S. Gersten, the Court refers to Attorney Sandra Gersten as Ms. Gersten, rather than Attorney Gersten, to avoid any confusion.

unless Fr. Cassem or his brother John left the Province, at which point that son would receive a one-half share. Attorney Gersten testified that she felt Fr. Cassem's intention to drain the trust was "offensive" because to do so would "change his whole way of living" after fifty years and they never discussed the possibility of Fr. Cassem leaving the Province. [Pl. Ex. 3 (S. Gersten Depo.) 168:01-168:25, 172:11-173:05]. Attorney Gersten did not discuss redirecting Fr. Cassem's Social Security checks away from the Province. [Pl. Ex. 3 (S. Gersten Depo.) 120:10-120:25]. She testified that Fr. Cassem "had no desire to face off and start a war with the Wisconsin Province." [Pl. Ex. 3 (S. Gersten Depo.) 156:19-157:21]. Ms. Gersten did not disclose any actual or potential conflict of interest in representing both him and Mrs. Cassem and did not obtain a conflict waiver. [Pl. Ex. 3 (S. Gersten Depo.) 80:21-81:12].

Fr. Cassem executed his Last Will and Testament in Ms. Gersten's Office on March 22, 2011. [Def. Ex. 8 (Fr. Cassem Will)]. Notably, his will directs that his ashes be divided an interred with his brother, his late parents, the Jesuit cemetery in Omaha, Nebraska, and the Jesuit Cemetery in Massachusetts. [*Id.* § 3]. Attorney Gersten testified that Fr. Cassem drove to and attended their estate planning meetings alone, except for one meeting where he attended with Mr. Owens concerning questions about a power of attorney. [Def. Ex. H. (S. Gersten Depo.) 34:18-36:16]. Fr. Cassem was unaccompanied by anyone when he signed the beneficiary designation forms at Ms. Gersten's office on January 11, 2011. [Def. Ex. H. (S. Gersten Depo.) 46:17-46:24].

17

The Province argues that Mrs. Cassem exerted increased control over Fr. Cassem and his finances after he moved in with her in December 2011, approximately a year after the beneficiary change. The Province cites Fr. Cassem's unexpected relocation to West Hartford without his personal effects while formally employed by MGH, his transfer of his new car to Mrs. Cassem in February 2012, her sale of his car and the purchase of another car, and approximately $56,000 in checks written by Mrs. Cassem on a joint account she maintained with Fr. Cassem from late 2012 through 2014. [Pl. D. Conn. Civ. L. R. 56(a)(2)(ii) ¶¶ 125-159]. Jane Glynn-Nass, one of the Province's 30(b)(6) witnesses, testified that Frs. Gladstone and Siberski visited Fr. Cassem in 2014 and that Fr. Cassem was not verbal, but was comfortable, looked clean, and was cared for. [Def. Ex. A. (Glynn-Nass Depo.) 63:01-64:03].

## Discussion

### a. Legal Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the

court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

b. <u>Parties' Arguments</u>

In support of their motion for summary judgment, the Defendants argue that the beneficiary designation was one of several valid, independent legal decisions that Fr. Cassem made while still living in Jesuit housing and practicing at MGH. [Dkt 145 (Def. Mem. in Supp. of Mot. for Summ. J) at 5-8]. The Defendants argue that Fr. Cassem's consistent diagnosis of Mild Cognitive Impairment, Grade II, CDR .05 is less severe than dementia and that their expert witness's testimony establishes that individuals with this condition continue to exercise sound judgment. [*Id.* at 18-24]. Defendants argue that the Province never took action to investigate Fr. Cassem's mental well-being. [*Id.* at 26-28]. The Defendants argue that a testamentary capacity applies to the capacity determination under Connecticut law. [*Id.* at 24-26]. The Defendants argue that the Province cannot show incapacity under a contractual legal standard for capacity either, as evidenced by the Province's expert's admission that Fr. Cassem had the capacity to execute the health care proxy form and to purchase the automobile within weeks of the beneficiary designation. [*Id.* at 28-32].

As to the Province's undue influence claim, the Defendants argue that the Province's corporate representatives, Fr. Lawler and Ms. Glynn-Mass, admitted that they were unaware of any specific actions by Mrs. Cassem or Mr. Owens to exert undue influence over Fr. Cassem, who was living in Jesuit housing at the time. [*Id.* at 32-37]. They argue that Fr. Cassem remained a strong-willed, independent person, who was making his own healthcare and financial decisions in January 2011. [*Id.* 37-38]. The Defendants argue that they had no knowledge of the retirement accounts when the beneficiary decision was made. [*Id.* at 40-42]. The

Defendants argue that the Province cannot establish the fourth element of their undue influence claim because Fr. Cassem previously expressed an intention to provide for his family, which was a natural and reasonable disposition of his assets. [*Id.* at 45].

In opposition, the Province argues that the capacity question is governed by the contractual standard of capacity, not the testamentary standard, pursuant to Conn. Gen. Stat. § 45a-347. [Dkt. 152 (Pl. Mem. in Opp'n.) at 4-7]. The Province argues that the Defendants' theory does not account for the implication of the beneficiary change on Fr. Cassem's Jesuit vows and his demonstrated commitment thereto. [*Id.* at 7-11]. The Province cites Fr. Cassem's declining cognitive abilities from 2008 through May of 2011. [*Id.* at 11-14](discussed *supra.* 7-14). The Province argues that the Defendants' expert witness's analysis fails to account for Fr. Cassem's vows, relies on deficient factual data, and is bias. [*Id.* at 15-25]. The Province argues that the Defendants' theories are inconsistent concerning Fr. Cassem's relocation to Connecticut and that Fr. Cassem wanted to provide for Mrs. Cassem, but she was slightly older than him and he did not direct funds to her within his lifetime. [*Id.* at 25-29]. The Province challenges any purported animosity between Fr. Cassem and the Province as inconsistent with the record. [*Id.* at 33-36].

As to the undue influence claim, the Province maintains that Mrs. Cassem influenced him over the weekends he visited with her and Ms. Gersten failed to disclose a conflict, failed to obtain a waiver of such conflict, failed to discuss Fr. Cassem's vows which are contractual in nature, and failed to provide basic legal advice responsive to her client's inquiries as to the family trust. [*Id.* at 39-42]. The

Province also argues that the structure of the estate planning was intended not to alert the Province of the beneficiary change, i.e. not rediverting his Social Security benefits or accessing the family's trust. [*Id.* at 30-34]. Finally, the Province cites the sale of Fr. Cassem's car and checks drawn by Mrs. Cassem on their joint account, over a year after the beneficiary change, as further exemplars of undue influence. [*Id.* at 44-47].

In reply, the Defendants argue that Conn. Gen. Stat. § 45a-347 provides that retirement designations are not "…subject to any statute or law governing the transfer of property by will," and does not address the standard applied for determining capacity and that Plaintiff's cited cases are distinguishable. [Dkt. 159 (Def. Repl. Br.) at 4-6]. The Defendants argue that the Province misstates the Court's earlier holding on the motion to dismiss when it argues that "vows of poverty do have legal bearing, and are routinely considered enforceable contracts under state law." [*Id.* at 7-8](quoting [Pl. Opp'n at 9]). The Defendants argue that Fr. Cassem's religious vows are irrelevant, except to the extent that he understood that he was benefiting the Defendants to the exclusion of all other parties, including the Province, upon his death and that Plaintiff's argument presents a false dichotomy. [*Id.* 8-12]. The Defendants argue that their expert's reliance on Dr. Growden's assessment was proper because he later testified that had he known the additional information about Fr. Cassem's activities, his diagnosis would not have changed, and their expert considered several other sources. [*Id.* at 15-21]. Finally, the Defendants argue that Plaintiffs have failed to establish that Ms. Gersten took direction from either Defendant or that either Defendant was aware of

Fr. Cassem's actions at the time the beneficiary designation was made. [*Id.* at 29-30].

### c. Whether Fr. Cassem was competent to execute the beneficiary designation on January 11, 2011.

#### a. Under Connecticut law, what standard of capacity is required for a valid beneficiary designation?

As addressed above, the parties do not agree on the applicable legal standard for evaluating whether an individual is competent to execute a beneficiary designation. The parties agree that the capacity to form a contract is different from and higher than the capacity necessary to execute a testamentary instrument. However, neither party cites a controlling case applying Connecticut law. The only Connecticut case that the Court could locate on point applies a testamentary standard.

The Court agrees with the Defendants' contention in their reply brief that the issue is not controlled by Conn. Gen. Stat. § 45a-347, as the Plaintiff argues. The statute states, in relevant part:

> The designation in accordance with the terms of (1) an insurance, annuity or endowment contract… (2) any … pension plan… retirement plan including a self-employed retirement plan, … individual retirement account, annuity or bond or simplified employee pension plan, of any person to be a beneficiary or owner of any right, title or interest thereunder upon the death of another, shall not be subject to any statute or law governing the transfer of property by will, even though such designation is revocable by the person who made it, or the rights of such beneficiary or owner are otherwise subject to defeasance.

There is surprisingly little case law interpreting § 45a-347. In *Newcomb v. Sweeney*, No. LLICV116004014S, 2014 WL 1193323, at *4 (Conn. Super. Ct. Feb. 26, 2014), the Connecticut Superior Court interpreted § 45a-347 as "making clear that IRAs are not subject to the statute of wills…," but the statute did not deprive the Probate

Court of jurisdiction over contested IRA beneficiary designations where the decedent's capacity was challenged.

In *Diana v. Diana*, No. FA9969335, 2001 WL 1200334, at *1-5 (Conn. Super. Ct. Sept. 14, 2001)(cited by Plaintiff at [Dkt. 152 at 9]), the decedent died during the pendency of his divorce from the plaintiff, but not before changing the beneficiary designations on existing life insurance policies in violation of the family court's automatic orders in the divorce proceeding. There, the court cited § 45a-347 for the proposition that "[i]nsurance death benefits are paid by the insurer directly to the named beneficiaries of the policy," meaning they are not the responsibility of the decedent's estate. *Diana*, 2001 WL 1200334, at *2. The plaintiff's avenue for recourse lied with the estate for a claim for the benefit's that she could have received, not against the life insurer or the substitute defendant for contempt. *Id.* at 3.

This Court interprets § 45a-347 to mean only that the beneficiary designation at issue need not satisfy the execution formalities under Connecticut's statute of wills, Conn. Gen Stat. § 45-250, *et seq.* *See also* § 11:7.Contingents; settlement: non-testamentary, 1 Life & Health Insurance Law § 11:7 (2d ed.)("It is simply a designation to the insurer of the person to whom it shall make a contractual payment upon the death of the insured.")(citing to § 45a-347 as an example of operation of this rule by statute).

The short legislative history to the 1989 amendment, which expanded the list of covered financial instruments to include IRAs, further supports this interpretation. Statement of Rep. Lupy, 1989 Conn. Acts 202, Vol. 32, Part 18, (6153):

"It includes some additional language that clarifies the treatment of beneficiary designations and retirement plans to make clear that you can do this outside of a will."; Statement of Sen. Avallone, 1989 Conn. Acts 202, Vol. 32, Part 18, (2295): "The bill would amend the section in Connecticut statutes to extend the exemption from compliance with the Connecticut statute of wills to beneficiaries. In other words, a person can name a beneficiary of his IRA without following the formalities of making a will."; *see also* Howard S. Tuthill III on behalf of the Exec. Comm. Of the Estates and Probate Sect. of the Conn. Bar. Assn., Mem. in Supp. of House Bill Memorandum in Support of House Bill No. 6796 Entitled An Act Concerning Claims Against Solvent and Insolvent Estates (expressing the view revocable beneficiary designations violate the statute of wills absent specific legislative intent and the purpose of the legislation is to cure the defect as to IRAs.).[6]

This interpretation especially makes sense in the context of employer-sponsored retirement plans because a requirement that a beneficiary designation comport with state law formalities governing wills would conflict with ERISA's requirement that plans be administered, and benefits paid, in accordance with plan documents. *See Egelhoff v. Egelhoff*, 532 U.S. 141 (2001).

The Defendants argue that the capacity question is controlled by a testamentary capacity standard because the beneficiary change is "testamentary in nature" and no benefits could be conferred until after Fr. Cassem's death. [Dkt. 145 (Def. Mem. in Supp. for Summ. J.) at 25]. The Defendants do not cite any legal

---

[6] The Court will include the archived legislative history for the 1989 amendment as an appendix to this decision.

25

authority for the proposition that Connecticut law treats an *inter vivos* beneficiary designation as a testamentary act. However, at least one Connecticut court applied a testamentary capacity standard in an IRA beneficiary designation contest. *See, e.g. Newcomb*, 2014 WL 1193323, at *12-13 (applying the testamentary capacity standard from *Deroy v. Baron*, 136 Conn.App. 123, 127–28, 43 A.3d 759 (2012))

In *Newcomb*, the decedent was an alcoholic who designated her neighbor's grandson as the beneficiary of four IRAs, rather than the decedent's stepchildren, whose late father acquired the accounts. *Newcomb*, 2014 WL 1193323, at *1, 6-7. The stepchildren challenged the beneficiary designations through six special defenses asserted through the probate litigation, including a lack of testamentary capacity. *Id.* at 7. The probate court held that the decedent's will was the product of undue influence exerted by a third party to the third party's benefit but did not find that the decedent lacked the testamentary capacity at the time she executed the beneficiary designations. *Id.* at 12-13. The Superior Court agreed but questioned whether "lack of testamentary capacity" was a valid special defense to an IRA beneficiary designation. *Id.* at 12. The court assumed that it was and concluded that the defendants offered no admissible evidence to show that the decedent lacked a testamentary capacity when the beneficiary designations were executed, beyond a showing that she was an alcoholic. *Id.* at 12-13.

The Plaintiff's argument for a contractual standard of capacity relies on § 45a-347, which again, does not stand for the proposition that a contractual standard of capacity applies to the asset classes listed in the statute. The only case Plaintiff cites for the proposition that § 45a-347 controls the issue of which

standard applies is *Diana v. Diana*, No. FA9969335, 2001 WL 1200334. There, as previously discussed, the superior court held that the contractual requirement that the life insurer pay the death benefit in accordance with the insured's beneficiary forms was not modified by the insured's breach of a preexisting legal duty, in that case, a family court order. [Dkt. 152 (Pl. Mem. in Opp'n) at 5]. It does not follow that the existence of a contractual relationship between a life insurer (or an employee welfare plan sponsor) and the insured dictates that a contractual standard applies to all dealings with third parties in relationship to that contract.

The issue of competency is much narrower. Under Connecticut law, "...[a] person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs." *Kunz v. Sylvain*, 159 Conn. App. 730, 741, 123 A.3d 1267, 1274 (2015)(quoting *Deroy*, 136 Conn. App. at 127–29); *see also Turner's Appeal*, 72 Conn. 305, 314 (1899)(same). "The law recognizes degrees of mental unsoundness, and not every degree of mental unsoundness or mental weakness is sufficient to destroy testamentary capacity. Absolute soundness of mind and memory in every respect is not essential to testamentary capacity. There is no particular degree of mental acumen which may be set up to serve as a standard for testamentary capacity. Testamentary capacity is not the same as the ability to transact ordinary business, or the capacity to execute a deed or contract.") *Deroy*, 136 Conn. App. at 129(quoting 79 Am.Jur.2d, Wills § 63 (2002). "To make a valid will, the testatrix must have had mind and memory sound enough to know and understand the business upon which she was engaged, that of the execution of a

will, at the very time she executed it." *Deroy*, 136 Conn. App. at 127–28 (quoting *Sanzo's Appeal from Probate*, 133 Conn. App. 42 (2012)).

Other cases distinguish between the capacity to execute a will and to revoke a trust. *Bassford v. Bassford*, 180 Conn. App. 331, 349 (2018)(citing *Kunz*, 159 Conn.App. 730). "The law on taking any action with respect to a trust requires the individual taking such action to have the mental capacity to undertake business." *Bassford*, 180 Conn. App. at 349. In *Kunz*, the Appellate Court declined to consider which standard applied because the court below found credible evidence to clearly establish that the decedent met either standard and the transaction at issue was a simple matter. 159 Conn.App. at 741-42. The Appellate Court rejected plaintiff's argument that the lower court erred in its analysis by "only apply[ing] testamentary principles" because he court clearly recognized that different mental capacities may be required for different sorts of transactions. The court appreciated the nature of the transaction in question and found that the settlor had a mental capacity adequate to understand and to effectuate that transaction." *Id*. at 742. Under *Kunz*, the complexity of the issue at hand is relevant in the determination of a person's required level of functioning. *See Bassford*, 180 Conn. App. at 351 (citing *Kunz*, 159 Conn. App. at 730).

The Court agrees with the Defendant's characterization of a beneficiary designation as a testamentary act. Like a will, the owner of a non-probate financial asset may revoke the beneficiary designation until the owner's death or incapacitation. Similarly, like a will and unlike a contract, the designation does not need to be supported by consideration. The Defendants do not argue that they are

entitled to the IRA in the absence of a beneficiary designation. Further, like a will, under most circumstances, the beneficiary does not receive any benefits until after the decedent's death and has only an expectancy of the benefit.

Thus, the Court concludes that Connecticut law would generally apply a testamentary standard of capacity to an IRA beneficiary designation, but in doing so considers the complexity of the transaction. In this case, the transaction at issue is simpler than amending the trust documents in *Kunz* and *Bassford*. The inquiry is into whether Fr. Cassem understood what changing his beneficiary meant, i.e. that upon his death, Ms. Cassem or Mr. Owens would receive his IRAs to the exclusion of all others, including the Province.

Because the benefit dispute involves the rights to receive benefits under an ERISA-qualified employee benefits plan, some courts have considered whether to apply a federal common law standard to the capacity determination. In *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000), the Sixth Circuit held that a former beneficiary's claim to invalidate a beneficiary designation for undue influence was preempted by ERISA, § 514(a) as "relating to" a benefit plan. (citing *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63, (1987). ERISA contains no provision governing the resolution of such disputes. Therefore, the mental capacity issue would be governed by federal common law. *See, e.g. Metro. Life Ins. Co. v. McCloskey*, No. 1:03 CV 1523, 2005 WL 3877436, at *3 (N.D. Ohio Dec. 23, 2005)(citing *Metro. Life Ins. Co. v. Hall*, 9 F. Supp. 2d 560, 564 (D. Md. 1998). In *Jones Funeral Home* v. *Phoenix Mutual*, 2008 WL 3982945 (W.D. Ark. Aug. 18, 2008), the district court applied the mental capacity standard for changing a military life

insurance policy from *Taylor v. United States*, 113 F.Supp. 143 (W.D.Ark.1953), *aff'd*, 211 F.2d 794 (8th Cir.1954) to an employer-sponsored group life insurance policy governed by ERISA:

> To be capable of effecting a valid change of beneficiary a person should have clearness of mind and memory sufficient to know the nature of the property for which he is about to name a beneficiary, the nature of the act which he is about to perform, the names and identities of those who are the natural objects of his bounty; his relationship towards them, and the consequences of his act, uninfluenced by any material delusions.
>
> *Id.* at 148.

The federal common law standard largely mirrors Connecticut law. With that in mind, the Court will consider whether the medical evidence and objective observations raise a genuine issue of material fact as to Fr. Cassem's testamentary capacity.

In this case, the resolution of the competency question turns on the medical evidence and observations of Fr. Cassem's behavior closest in time to the execution of the beneficiary designation on January 11, 2011.  The weight of the evidence diminishes the further removed in time from the execution of the instrument. *Jackson v. Waller*, 126 Conn. 294, 301 (Conn. 1940); ('It cannot be doubted that the admission of testimony as to acts and conduct of the testator at times before and after the will was made is often calculated to produce a false impression on the minds of jurors, or at least have undue influence over them, unless very carefully guarded." *Id.* at 302–03(quoting *Harris v. Hipsley*, 122 Md. 418, (1914)). Under this standard, Fr. Cassem's religious vows are not material.

Plaintiff's argument that the Court already determined that Fr. Cassem was contractually bound by his religious vows misinterprets and misapplies the Court's ruling on the Defendants' motion to dismiss. [Dkt. 152 (Pl. Mem. in Opp'n) at 13, 15]. The Court did <u>not</u> hold that Fr. Cassem's vows were enforceable. Rather, the Court held that Plaintiff's common law contractual claim for specific performance, i.e. that Fr. Cassem did not own the accounts because of his vows, operated as a matter of state law, not federal common law. [Dkt. 74 (Mem. of Decision on Def. Mot. to Dismiss) at 7-10]. The Province's contractual claim for specific performance was preempted by ERISA, 29 U.S.C. § 1144(a), because it conflicted with ERISA's anti-alienation provision, 29 U.S.C. § 1001(a). [*Id.* at 10-23]. The Court's decision extended no further. Contrary to Plaintiff's assertions, the Court did not hold that "vows of poverty do have legal bearing, and are routinely considered enforceable contracts under state law." [Dkt. 152 (Pl. Mem. in Opp'n) at 13].

Plaintiff's argument is that, since disposition of his property to any party other than the Province ran contrary to Fr. Cassem's religious vows, which he never renounced, it necessarily follows that the decision was the product of mental incapacity. *See* [Dkt. 152 (Pl. Mem. in Opp'n) at 9-11]. This argument is meritless. First, it assumes that the disposition of assets to any party other than the Province must result from incompetency or a corrupted process. For sake of argument, Plaintiff's argument would apply equally if Fr. Cassem made the beneficiary designation years earlier when he was at the pinnacle of his profession, demonstrating superior mental acumen. The argument fails to account for the possibility of any other rational choice. Since the Court has already dismissed

Plaintiff's breach of contract claim for specific performance, Fr. Cassem's rationale for breaching his vows is immaterial, so the remaining inquiry considers only the process of the beneficiary designation. Delving into the reasoning for the decision may impermissibly inquire into Fr. Cassem's religious conscience and the degree to which he conformed with the doctrine and practices of the Province, an issue that an Article III court ought not to consider. *See Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969).

It is evident that Fr. Cassem began experiencing some decline in his mental functioning around February 2010 when he was first assessed by Dr. Growdon. This occurred at around the same time that the peer review investigation into Fr. Cassem's fitness to continue to practice medicine was underway. The neuropsychological evaluation later that spring, which relied on diagnostic imaging, testing, observation, and Fr. Cassem's subjective statement of activities, showed largely intact cognition, but impaired memory and judgment. Significantly, the psychologist noted that he got lost at MGH where he practiced and then brought patient notes to the rescheduled appointment.

Construing ambiguity in favor of the Province as the Court must, a reasonable jury could find that Fr. Cassem's mental functioning began to deteriorate, or as Dr. Growdon testified, "hit the skids," sometime by early to mid-2011. For example, Fr. Cassem's Blessed Dementia Scale score jumped 5 points, from a 3 to 8 in January 2011, just a week before the beneficiary change, and Dr. Growdon prescribed him new medication. [Pl. Ex. 39 (Patient Note, 01/03/2011)].

The evidence surrounding Fr. Cassem's activities at the time is also conflicting and not necessarily dispositive. The scope of Fr. Cassem's teaching and/or clinical duties is uncertain, and the parties' experts reasonably disagree as to the conclusions that can be drawn from the fragmented evidence on this issue. Further, as to Fr. Cassem's execution of the health care proxy forms, the Court agrees with the Province that Dr. Jenike's testimony is inconsistent and the Court cannot draw any conclusions as to Dr. Fricchione's testimony on the issue. Fr. Cassem was accompanied by Dr. Jenike when he purchased the car and the degree to which Fr. Cassem exercised decision-making ability was not established. Further, the Province showed Dr. Jenike intervened out of concerns over Fr. Cassem's unsafe handling and storage of firearms. Fr. Cassem's emails were disjointed and threatening about four months after the beneficiary designation. Moving further away from the beneficiary designation, the occupational therapist's observations of Fr. Cassem's demeanor and behavior also suggests that Fr. Cassem's subjective reports to clinicians about his daily activities, particularly driving, may not be credible. The inquiry is further complicated by the fact that Fr. Cassem was once an eminent psychiatrist.

Unlike *Bassford*, where the decedent was also a physician suffering from mild to moderate dementia, Fr. Cassem's execution of the beneficiary designations were not the product of months of estate planning where his position was unwavering and consistent. *Bassford*, 180 Conn. App. at 349-52. Rather, as Ms. Gersten testified, Fr. Cassem sought to deplete funds from the family trust, which would have inured to the benefit of the Province but did not do so because he

wanted to avoid a confrontation. Similarly, his Social Security and paychecks were still being remitted to the Province. *Cf. Bassford* 180 Conn. App. at 343 (decedent redirected pension funds back to his own account for his own use). The trial court in *Bassford* also benefited from the fact that Dr. Bassford's attorney requested a psychiatric assessment that specifically opined on his "cognitive ability to know the nature and extent of his assets and what he wanted to have done with them." *Id.* at 344. Neither of these estate planning aspects is necessarily consistent with a stated desire to provide for Ms. Cassem and Mr. Owens or disinheriting the Province.

On the other hand, Fr. Cassem achieved the conflicting objective he expressed to Ms. Gersten.  He wanted to financially benefit his sister-in-law and nephew without going to "war" with the Province.  By changing the beneficiary from the Province to his family members, an act about which the Province would not learn until after his death, he left the relatively paltry trust corpus to the Province and the larger amount to his family and avoided a confrontation with the Province. In doing so he displayed an understanding of his assets, the individuals he wanted to benefit and those he did not, the options he had of disposing of his assets, the compromise he had to make to achieve his competing goals, and the consequences of the option he chose. Fr. Cassem untied the Gordian Knot and achieved both objectives, suggesting his mind was sufficiently intact to satisfy the Connecticut contractual and testimonial as well as the federal common law competency standards.

The plausibility of both these scenarios however create a genuine issue of material fact as to Fr. Cassem's competency on January 11, 2011 which must be resolved by a jury. Accordingly, summary judgment on Count Two of the Amended Complaint must be DENIED.

### d. Whether Defendants carry their burden on summary judgment as to Plaintiff's undue influence claim.

The standard for invalidating a beneficiary designation on the basis of undue influence is a less quarrelsome issue. The parties agree on the elements of the claim and the Court adopts their citation to *Pickman v. Pickman*, 6 Conn. App. 271, 275-76 (1986) as the statement of law on the issue. "Undue influence is the exercise of sufficient control over a person, whose acts are brought into question, in an attempt to destroy his free agency and constrain him to do something other than he would do under normal control." *Pickman,* 6 Conn. at 275-76 (citing *Reynolds v. Molitor*, 184 Conn. 526, 528, 440 A.2d 192 (1981)).

> "It is stated generally that there are four elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." 25 Am.Jur. 397–98,25 Am.Jur. 397–98, Duress and Undue Influence § 36. Relevant factors include "age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction ... consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth ... failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties."

*Pickman*, 6 Conn. App. At 275–76.

"There must be proof not only of undue influence but that its operative effect was to cause the testator to make a will which did not express his actual

testamentary desires." *Bassford*, 180 Conn. App. at 355 (citing *Hills v. Hart*, 88 Conn. 394, 402 (1914)). Put another way, influence is undue when it overcomes or supplants the will of the person over which it is exerted. Circumstantial evidence may be used to establish the elements of the claim. *Tyler v. Tyler*, 151 Conn. App. 98, 107 (2014).

The Defendants argue that these elements must be established by clear and convincing evidence. [Dkt. 145 (Def. Mem. in Supp.) at 33-34](citing *Coppola v. Keeran*, No. NNHCV176068306S, 2018 WL 6503209, at *8 (Conn. Super. Ct. Nov. 20, 2018)). Since Mrs. Cassem was not in a fiduciary position with respect to Fr. Cassem at the time the beneficiary designations were made, the Court agrees that a clear and convincing evidence standard applies under Connecticut law. *See Bassford*, 180 Conn. App. at 333 (" … plaintiffs had failed to prove by clear and convincing evidence that the defendant had exercised undue influence over the decedent in executing the 2012 will...").

At the time the beneficiary designation was made, Fr. Cassem was living in Jesuit housing in Weston, Massachusetts and visiting Mrs. Cassem for long weekends. The evidence suggests that, up until Christmas 2011, he was driving himself to work and to her home. Further, there is no showing of any reliance on Mrs. Cassem during this period. If anything, Fr. Cassem was reliant on Dr. Jenike. Neither Mrs. Cassem nor Mr. Owens accompanied Fr. Cassem to Ms. Cassem's office when he executed the beneficiary designation. Under these circumstances, no reasonable fact finder could conclude that Mrs. Cassem had the opportunity to exert undue influence on Fr. Cassem on January 11, 2011. In addition as noted

above, Fr. Cassem fulfilled his stated objectives of leaving his assets to his family members without a confrontation with the Province.

As to whether the Province can establish that the Defendants had a disposition to exert undue influence, the Court agrees with the Defendants that the trial court's decision below in *Kunz* is instructive. *Kunz v. Sylvain, No.* CV116004340S, 2014 WL 1568613, (Conn. Super. Ct. Mar. 21, 2014), *aff'd*, 159 Conn. App. 730. There, the trial court found no credible evidence to suggest that the defendants, the decedent's children and widow, had dispositions to exert undue influence. *Kunz*, 2014 WL 1568613, at *9. The court reached this conclusion based on the facts that the beneficiaries did not take an active role in the decedent's finances, that the decedent was not socially isolated, the beneficiaries were unaware of the intended beneficiary change, and there was no evidence that they tried to influence the beneficiary change. *Id.* Each of these considerations applies equally here.

The Defendants initially argued that the Province cannot establish either Defendant had knowledge of the IRAs or knew that they were designated as the beneficiaries until his death. [Dkt. 145 (Def. Mem. in Supp. of Mot. for Summ. J.) at 41]. The Defendants' reply brief clarifies that Ms. Cassem learned of the accounts from Fr. Cassem in the fall of 2011 and then learned that she was designated as the beneficiary after he moved into her home over Christmas in 2011. [Dkt. 159 (Def. Repl. Br.) at 32-33]; [Dkt. 152 (Pl. Mem. in Opp'n) at 38, n. 12].  Attorney Gersten's notes indicate that the beneficiary forms were supposed to be mailed to Fr. Cassem both at his address in Weston, Massachusetts and  Mrs. Cassem's address in West

Hartford. [Pl. Ex. 36 (S. Gersten notes)]. An undated handwritten note between November 29, 2010 and January 11, 2011 states "Ned and Audrey reported that 1300+/- received from TIAA CREF in Ned's account and a bank check was drawn to Ned." [*Id.*]. This correspondence infers that Mrs. Cassem was aware of an account with TIAA-CREF, but not necessarily that he intended to change his beneficiary information as Mrs. Cassem testified that she would not have opened his mail. [Pl. Ex. 4 (A. Cassem Depo.) 258:01-258-18)].

Both of the Province's corporate representatives were unaware of specific actions taken by either Defendant to exert undue influence on the beneficiary designation. The financial information showing that Mrs. Cassem sold Fr. Cassem's car and began spending out of a joint account concerns activity well over a year after the beneficiary designation, at which point Fr. Cassem's condition had declined further and he was living with her. As of January 2011, Fr. Cassem remained at least "present" at MGH and lived in a communal setting among the Jesuits; there is no evidence that he was socially isolated. On the contrary, the evidence shows he saw and relied on friends who played an active role in his life and affairs.

The Province argues that Ms. Gersten's "conflicted" role in representing both her close friend Mrs. Cassem and Fr. Cassem is indicative of undue influence. But, Fr. Cassem knew Ms. Gersten socially prior to their attorney-client relationship and she was friends with his sister-in-law and late brother. The Province does not offer evidence to show that either Defendant referred Fr. Cassem to Ms. Gersten or that Ms. Gersten solicited his business or suggested that he make the beneficiary

change. The Province argues that Ms. Gersten was conflicted, but they do not cite specific authority as to how her representation violated an ethical rule. The Province does not demonstrate how Attorney Gersten's failure to canvas Fr. Cassem as to his Jesuit vows amounts to an ethical violation, given that the enforceability of the vows is not clearly established. *See* Conn. R. of Prof. Conduct R. 2.1("In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer *may* refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.")(emphasis added). Ms. Gersten's refusal to advise Fr. Cassem on the dissipation of the Trust inured to the benefit of the Province and undermines its claim that she was conflicted or was unduly influencing Fr. Cassem at the behest or on behalf of  Mrs. Cassem or Mr. Owens.

More importantly, the Province does not show how Ms. Gersten's arguable conflict can be imputed to her client. The Province does not suggest that Ms. Gersten somehow breached her clients' confidences, that Mrs. Cassem or Mr. Owens paid for Fr. Cassem's representation, or that Ms. Gersten took direction from either Defendant as to the disposition of Fr. Cassem's property or his legal affairs.

Fr. Cassem's relationship to the beneficiaries does not suggest undue influence, but rather familial love and gratitude. Ms. Cassem and Mr. Owens were Fr. Cassem's sole surviving family members. He had a close longstanding relationship with them, even after his brother's death. They regularly welcomed

him into their home and included him in family holidays, even when he maintained an active practice at MGH. The closeness of their relationship is apparent from the fact that without even knowing about the beneficiary designation Mrs. Cassem took him into her home after his hospital privileges were revoked, he resigned his teaching position, and his health was on the decline. Along with the Province, they were the natural bounty of his largesse. He also apparently had the right to renounce his vows as his brother had done. In the end he divided his assets among the people who sustained him.  He did this before he went to live with Mrs. Cassem. There is nothing inherently suspicious about such a gesture of love and affiliation.

Consequently, even if the Province established that Fr. Cassem was susceptible to influence because of his deteriorating mental health,  they have presented no evidence that either Mrs. Cassem or Mr. Owens, had the opportunity to exert undue influence,  a disposition to exert undue influence or in fact did exert undue influence over Fr. Cassem causing him to designate them beneficiaries. The Court declines to consider the remaining elements of this claim. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment as to the Province's claim of undue influence, Count Three of the Amended Complaint [Dkt. 44].

## Conclusion

For the aforementioned reasons, the Court DENIES Defendants' motion for summary judgment as to Count Two of the Amended Complaint seeking a Declaratory Judgment that Fr. Cassem's Beneficiary Designation is Invalid for Lack of Capacity. The Court GRANTS Defendants' motion for summary judgment as to

Count Three, which seeks to invalidate the beneficiary designation because of undue influence.

Additionally, as the Court addressed during the pre-trial scheduling conference, if the parties are desirous of engaging in a pre-trial settlement conference, the Court encourages the parties to act promptly as the Court is disinclined to continue trial dates to accommodate settlement discussions. Should the parties decide to proceed with trial, the Court expects that their efforts will comport with the policy goals of Fed. R. Civ. P. 1. The parties are directed to closely follow this Court's Chambers Practices as they prepare for trial. A final Joint Trial Memorandum deadline will be entered contemporaneously with this decision.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 14, 2020